UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS, et al.,<br><br>                     Plaintiffs,<br><br>   -against-<br><br>CITY OF NEW YORK, et al.,<br><br>               Defendant. | Index No. 25-cv-1936 (NRB)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

**TABLE OF CONTENTS**

                                                                    PAGE NO.

THE AMENDED COMPLAINT ADEQUATELY PLEADS BOTH
DECLARATORY RELIEF AND ORGANIZATIONAL STANDING ........................................1

BACKGROUND ...............................................................................................................2

THE MOTION TO DISMISS SHOULD BE DENIED .................................................5

    I.       CAIR-NY Has Organizational Standing Because the NYPD's Practice Impairs
           its Core Business Activities and Frustrates Its Mission, Creating a Perceptible
           Opportunity Cost.........................................................................................5

    II.      Declaratory Relief is Appropriate to Remedy Plaintiffs' Ongoing Harms,
           Which Compensatory Damages Cannot Address, and to Prevent
           Future Injuries from the NYPD's Policy of Hijab Removal.......................................10

CONCLUSION...............................................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85
(2d Cir. 2023)............................................................................................................ 11

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227
(1937)....................................................................................................................... 11

*Afr. Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362
(S.D.N.Y. 2025)..................................................................................................... 6, 8, 9

*An v. City of New York,* No. 16-cv-5381 (LGS), 2017 WL 2376576
(S.D.N.Y. June 1, 2017)............................................................................................. 12

*Baez v. N.Y. State Off. of Temp. & Disability Assistance,* No. 24-cv-3282 (ER),
2025 WL 950680
(S.D.N.Y. Mar. 28, 2025) ........................................................................................... 6

*Battle v. City of New York*, No. 11-cv-3599 (RMB), 2012 WL 112242
(S.D.N.Y. Jan. 13, 2012)......................................................................................... 12, 13

*Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220
(2021)....................................................................................................................... 14

*Bost v. Ill. State Bd. of Elections*, 223 L.Ed.2d 357
(U.S. 2026)............................................................................................................... 6, 7

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
868 F.3d 104
(2d Cir. 2017)......................................................................................................... 6, 7, 9

*Chelsea Grand, LLC v. N.Y. Hotel & Motel Trades Coun*cil, 729 F. App'x 33
(2d Cir. 2018)............................................................................................................ 11

*Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167
(2d Cir. 2021)......................................................................................................... 6, 7, 9

*Davis v. City of New York*, 902 F. Supp. 2d 405
(S.D.N.Y. 2012)................................................................................................... 11, 12, 13

*Deshawn E. v. Safir*, 156 F.3d 340
(2d Cir. 1998)....................................................................................................... 11, 14, 15

*Dorce v. City of New York*, 2 F.4th 82
(2d Cir. 2021)....................................................................................................... 11, 14, 15

*FDA v. All. For Hippocratic Med.*, 602 U.S. 367
(2024)......................................................................................................... 6, 7, 8, 10

*Floyd v. City of New York*, 283 F.R.D. 153
(S.D.N.Y. 2012) ................................................................................................ 12, 13

*Havens Realty Corp. v. Coleman*, 455 U.S. 363
(1982)..................................................................................................................... 7

*Jones v. Ford Motor Credit Co.*, No. 00-cv-8330 (RJH), 2005 WL 743213
(S.D.N.Y. Mar. 31, 2005) ........................................................................................ 14

*Kachalsky v. Cacace*, 817 F. Supp. 2d 235
(S.D.N.Y. 2011) ................................................................................................ 14, 15

*Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 558
(S.D.N.Y. 2018) ................................................................................................ 14, 15

*Moya v. U.S. Dep't of Homeland Sec'y*, 975 F.3d 120
(2d. Cir. 2020)................................................................................................... 7, 10

*Nnebe v. Daus*, 644 F.3d 147
(2d Cir. 2011).................................................................................................... 7, 9

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237
(1952)................................................................................................................... 11

**THE AMENDED COMPLAINT ADEQUATELY PLEADS BOTH
DECLARATORY RELIEF AND ORGANIZATIONAL STANDING**

Zarmeen Azam and Shajnin Howlader had their hijabs torn off by officers with such force that they both thought they would die. That experience still torments them today: both its searing memory and the threat that they will suffer the same experience again if they return to the streets to participate in protests.

The Council on American-Islamic Relations New York ("CAIR-NY") is a frontline grassroots organization that counseled both Ms. Azam and Ms. Howlader, as well as more than a half-dozen other women victimized by the New York City Police Department's ("NYPD's") unconstitutional practice of forcibly and publicly tearing off protestors' hijabs as a method of crowd control through intimidation and religiously targeted violence.

This case seeks to have the NYPD's hijab removal practice declared unconstitutional and to make Plaintiffs whole for the injuries they have already suffered. The City's thin response— challenging the right to declaratory relief and organizational standing—has no merit.

First, CAIR-NY has standing because it has been directly harmed by the NYPD's practice: it has had to undertake new activities in response that it otherwise would not engage in (at the expense of those activities it was already undertaking). As a result, it is harder to vindicate its mission. These new activities—described in detail in the Amended Complaint—are the paradigmatic example of what gives an organization standing to vindicate its rights.

Defendants are likewise wrong that declaratory relief is inappropriate. The NYPD's continuing unconstitutional practice creates a significant likelihood that the NYPD will tear off more women's hijabs, and it causes ongoing harm to Plaintiffs, none of which can be remedied through compensatory damages alone.

1

## BACKGROUND

Twice, on August 14, 2024, NYPD officers ripped off women's hijabs, strangling them with their own headscarves. Zarmeen Azam and Shajnin Howlader had been standing amongst a crowd of protestors outside a political fundraiser calling for a ceasefire in Gaza. ¶ 22.[1] The protest was peaceful. ¶ 23. When the fundraiser moved for the after party to a restaurant a block away, the protestors also walked down the street. ¶ 24. Soon after the protestors and police gathered near the restaurant, NYPD officers began kettling, pepper spraying, and otherwise using force against protestors and members of the media. ¶¶ 25–26.

Ms. Howlader was on the outer edges of protestors, making her an easy and visible target for the police, particularly as the only person wearing a hijab in the vicinity of where she stood. ¶ 28. Sergeant Joseph Spalding stood directly in front of Ms. Howlader, blank-faced, stared her straight in the eye, and suddenly yanked the end of her hijab. ¶ 32. The force pulled Ms. Howlader's hijab halfway off her head, tangled around her neck, and constricted her breathing more and more as Sergeant Spalding continued pulling. ¶ 33. Ms. Howlader tried to cover her exposed hair and plead she could not breathe, but the sergeant, stone-faced, did not loosen his tight-fisted clutch of Ms. Howlader's hijab. ¶ 34. The stranglehold was so painful that Ms. Howlader did not even realize another officer also pepper-sprayed her until other protestors were eventually able to pull the end of Ms. Howlader's hijab out of Sergeant Spalding's hand, move her to safety, and wash her stinging eyes. ¶ 36. Ms. Howlader was not arrested. ¶ 37. She has suffered—and continues to suffer—trauma from the NYPD's brutalization. ¶¶ 39–40.

Mere feet away, on the same night and at the same protest, Assistant Chief Ruel R. Stephenson walked past Ms. Azam before suddenly whirling around and pushing through the

---

[1] Unless otherwise noted, all citations to "¶ __" refer to paragraphs in the Amended Complaint, Dkt. No. 21.

crowd to yell directly at Ms. Azam, "Don't put your hands on me!" ¶ 47. As is visible in video of the incident, screenshotted in the complaint, Assistant Chief Stephenson had not walked next to Ms. Azam, nor had she touched him, so she did not understand why he had singled her out. *Id*. Assistant Chief Stephenson grabbed Ms. Azam's hijab at her throat and threw her to the ground. ¶ 48. For several minutes, with one hand, he kept a stranglehold on Ms. Azam's neck through her headscarf; and with the other hand, he swung his baton at protestors who tried to help. ¶ 49. Ms. Azam thought she would die. ¶ 51. Assistant Chief Stephenson eventually pulled Ms. Azam's hijab completely off her head. ¶ 53. Ms. Azam was subsequently arrested, and the police kept her for hours with her hair forcibly uncovered. ¶¶ 59–60. Ms. Azam was released with desk appearance tickets for disorderly conduct, which were soon thereafter dismissed. ¶ 61. Ms. Azam, too, has suffered—and continues to suffer—trauma from the NYPD's brutalization. ¶ 66.

Ms. Azam and Ms. Howlader's experiences were not unique. They are further examples of a growing police practice of forcibly and publicly removing women's hijabs at protests as a form of brutal crowd control through intimidation and religiously targeted violence. As a longtime frontline responder to abuses of the civil rights of New York's Muslim community, CAIR-NY has fielded reports from at least seven other women who also had their hijabs forcibly removed by the NYPD at different protests. ¶ 71. Notably, this number has increased during the pendency of the case. *Compare* Dkt. No. 1 ¶ 71 (five in March 2025), *with* ¶ 71 (seven in September 2025). In other words, these are not isolated incidents: the NYPD is *still* tearing off women's hijabs at protests. The NYPD's practice has deterred women who have experienced this, as well as individuals who witness it even if they do not wear hijab, from engaging in First Amendment protected activity that they would otherwise engage in, but for their fear of the NYPD's unconstitutional behavior. ¶ 76. People are afraid to attend protests for fear that they

3

will exercise one First Amendment right—free speech—at the expense of another First Amendment right—free exercise of religion. ¶ 77.

As a grassroots legal advocacy organization dedicated to enhancing the understanding of Islam, protecting civil rights, promoting justice, and empowering Muslims, CAIR-NY has also suffered significant injuries. ¶¶ 102–03. Because of the NYPD's practice of tearing off protestors' hijabs, CAIR-NY has had to develop Know Your Rights trainings on protestor rights and First Amendment activity; increase its community programming concerning Islamophobic police encounters; create new workshops focused on hijab-wearers' discriminatory interactions with the NYPD; and engage in legal monitoring work at protests. ¶¶ 89–92, 97. The increase in NYPD misconduct and resulting community distrust in the NYPD also means that CAIR-NY has had to increase the time and resources it spends assisting community members in seeking accountability, including by bringing more litigation and pre-litigation actions and by taking on a mediatory role to advocate on victims' behalf to prosecutors and police. ¶ 95. These are all new activities that CAIR-NY must engage in to protect Muslims that it otherwise would not have done but for the NYPD's misconduct—which has had the secondary consequence of forcing CAIR-NY to reallocate its time and resources away from other programming it would otherwise do in furtherance of its mission. CAIR-NY is also less well able to carry out its historical activities in furtherance of its mission. For example, CAIR-NY is now less able to defend hate crime victims because those victims are more often afraid of the police—of the individuals who would be responsible for protecting those victims' rights, investigating the crimes, and prosecuting the offenders. ¶ 94. It is also less well able to empower Muslims to exercise their First Amendment rights, defend religious liberty, and amplify speech about Islam and Muslim rights now that the NYPD is chilling those same rights. ¶¶96, 98.

Plaintiffs filed this suit on March 9, 2025, Dkt. No. 1, and amended their complaint on September 26, 2025, Dkt. No. 21. On January 9, 2026, Defendants moved to dismiss one of Plaintiffs' twelve claims (for declaratory relief) and to dismiss CAIR-NY as an organizational plaintiff. Dkt. No. 28.

### THE MOTION TO DISMISS SHOULD BE DENIED

Neither of Defendants' two attempts to dismiss the Amended Complaint has merit.

First, CAIR-NY has organizational standing because the NYPD's practice of tearing off hijabs at protests as a method of crowd control has forced CAIR-NY to engage in new activities that it otherwise would not do, to the detriment of those activities it already conducted, and it impairs the efficacy of its historical activities. Although Defendants cite the correct law regarding organizational standing, they overlook most of CAIR-NY's standing allegations.

Second, declaratory relief is appropriate here because the NYPD continues to tear off women's hijabs—meaning more people will be injured in the future—and Plaintiffs continue to suffer ongoing harms from the NYPD's past misconduct. Defendants mischaracterize Plaintiffs' allegations as merely concerning isolated past acts, but this cramped view fails to engage with Plaintiffs' ongoing threats and fear, which give rise to standing for prospective relief.

I.    **CAIR-NY HAS ORGANIZATIONAL STANDING BECAUSE THE NYPD'S PRACTICE IMPAIRS ITS CORE BUSINESS ACTIVITIES AND FRUSTRATES ITS MISSION, CREATING A PERCEPTIBLE OPPORTUNITY COST**

Defendants' motion to dismiss CAIR-NY for want of organizational standing should be denied because, although the parties agree as to the relevant standard, Defendants ignore Plaintiffs' well-pled allegations in the Amended Complaint, which meet that standard. Because the Amended Complaint alleges CAIR-NY has been harmed in its mission and core business activities by the NYPD's practice of tearing off protestors' hijabs, CAIR-NY has organizational standing.

Plaintiffs must have a "personal stake" in a case; they must be "able to answer a basic question: 'What's it to you?'" *Bost v. Ill. State Bd. of Elections*, 223 L.Ed.2d 357, 362 (U.S. 2026) (citations omitted). When suing to vindicate its own rights, "an organization shows injury-in-fact where, as here, a policy has impeded, and will continue to impede, the organization's ability to carry out its responsibilities." *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (cleaned up and citations omitted).[2] An organization may demonstrate standing if defendants' actions either "directly affect[] and interfere[] with [the organization's] core business activities," *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 395 (2024), or "directly impede the organization's ability to carry out its mission." *Baez v. N.Y. State Off. of Temp. & Disability Assistance,* No. 24-cv-3282 (ER), 2025 WL 950680, at *7 (S.D.N.Y. Mar. 28, 2025) (citation omitted).[3]

Accordingly, where an organization previously engaged in mission-furthering or core activities "A" and "B," but defendants' misconduct requires that the organization now spend more time on A at the expense of the quality and quantity of its work on B, the resulting "perceptible opportunity cost" gives rise to standing. *See Afr. Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362, 380 (S.D.N.Y. 2025) (collecting cases). Likewise, standing exists where a burden "is imposed on an organization when there is an increased demand for an organization's services." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 174 (2d Cir. 2021) (collecting cases). Notably, an organization need not completely stop some or all of its activities in furtherance of its mission; it need only establish that those activities are hindered, more costly, or

---

[2] Defendants' motion, at length, tilts at the windmill of CAIR-NY's lack of associational/representational standing. But CAIR-NY has never claimed otherwise. CAIR-NY has standing for *its* injuries, not on behalf of any members.

[3] To establish standing, in addition to an injury-in-fact, a plaintiff must also show causation. *FDA*, 602 U.S. at 381. Defendants here only challenge the injury-in-fact prong of standing.

otherwise have "less efficiency and success" now. *Moya v. U.S. Dep't of Homeland Sec'y*, 975 F.3d 120, 130 (2d. Cir. 2020) (quotations omitted). Moreover, even "scant" evidence of an opportunity cost will suffice. *Nnebe v. Daus*, 644 F.3d 147, 156–157 (2d Cir. 2011).

For instance, where a regulation led a taxi workers alliance to begin to counsel taxi drivers suspended by operation of that regulation, the Second Circuit held the organization had standing. *Id.* It observed that, "[e]ven if only a few suspended drivers are counseled by [plaintiff] in a year, there is some perceptible opportunity cost expended by the [plaintiff], because the expenditure of resources that could be spent on other activities "constitutes far more than simply a setback to [plaintiff's] abstract social interests." *Id*. (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Likewise, the Second Circuit held an organization dedicated to advancing the interests of day laborers could challenge a local ordinance prohibiting roadside employment solicitation because the ordinance's enforcement would (1) disperse and reduce the number of day laborers in the area, making it more difficult for the organization to organize laborers, and (2) the organization would have to reallocate resources from its other activities to combat the ordinance. *Centro De La Comunidad*, 868 F.3d at 110–11. Each of those distinct concrete, particularized injuries gave rise to standing. *Id.*

What is prohibited is for an organization to "spend its way into standing." *FDA*, 602 U.S. at 394. In other words, a plaintiff cannot "manufacture standing by voluntarily incurring costs" to convert social interests into economic injuries. *Bost*, 223 L.Ed.2d at 366 (internal quotation marks and citation omitted). But if the organization incurs costs "to mitigate or avoid a substantial risk of some *independent* harm," standing is appropriate. *Id.* (emphasis added) (internal quotation marks and citations omitted); *see also Conn. Parents Union*, 8 F.4th at 173 (holding that "the challenged law or regulation must impose a cost (*e.g.*, in time, money, or

danger) that adversely affects one of the activities the organization regularly conducted (prior to the challenged action)" rather that organization merely volunteering extra effort on an issue as part of its normal advocacy without the policy compelling any new expenditure or obstacle). The key difference is whether the plaintiff organization expended resources to meet the new needs of the community it serves in response to "proceedings initiated by another party," as opposed to expending resources to bring the exact litigation in which it seeks standing, irrespective of if community needs changed. *Compare Afr. Cmtys. Together*, 799 F. Supp. 3d at 381 (standing where immigration legal services organization that had to move staff resources from direct, full-scope litigation to a drop-in emergency legal clinic after the government's immigration policies increased the number of removal orders in absentia requiring immediate counsel), *with FDA*, 602 U.S at 385, 394 (no standing where medical association disagreed with FDA policies on mifepristone and so conducted studies and drafted citizen petitions to "gather information and advocate against" the policies, but the FDA's policies did not "require[] the plaintiffs to do anything or to refrain from doing anything"). In other words, standing exists not where the organization has spent money on advocacy work against the challenged policy, but where it has instead been forced to expend resources mitigating real-world impacts of the challenged policy that interfere the organization's core business activities or impair its mission.

Defendants disagree with none of this. They concede that organizational standing exists where "the challenged action perceptibly impairs the organization's activities," either through an "opportunity cost" or other "involuntary material burden on the established core activities by which its organizational mission has historically been carried out." Dkt. No. 28-1 (Defs.' Mot. to Dismiss) at 12–13 (citations omitted and cleaned up). None of their citations hold otherwise. But, in moving to dismiss, they ignore several of CAIR-NY's pled injuries and then mischaracterize

8

the impact of the NYPD's policy on CAIR-NY as merely changing the *content* of its workshops and trainings. *Id.* at 13. Not so.

The Amended Complaint alleges CAIR-NY has had to undertake several kinds of new activities that it otherwise would not have engaged in, which has necessarily strained its ability to continue its preexisting core activities through which it historically carried out its mission. CAIR-NY has had to develop *new* trainings and workshops on protestor rights, First Amendment activity, and discriminatory interactions with the NYPD, in addition to those it already regularly led; *increase* its community programming concerning Islamophobic police encounters on top of programming it already did; and *begin* engaging in legal monitoring work at protests for the first time, again, on top of the other litigation, policy, and advocacy work it already did. ¶¶ 89–92, 97. CAIR-NY has also had to increase its allocation of time and resources spent on assisting community members seeking accountability. ¶ 95. This is precisely the sort of "increased demand for an organization's services" the Second Circuit has approved as the basis for standing. *Conn. Parents Union.* 8 F.4th at 174.

CAIR-NY's position is analogous to that of the immigration legal services organization, taxi workers alliance, and day laborers' rights organization forced to, in response to a new governmental policy, undertake new initiatives to serve their communities at a level equivalent to what they historically had been doing in furtherance of their missions. *See Afr. Cmtys. Together*, 799 F. Supp. 3d 362 at 381; *Nnebe*, 644 F.3d at 157; *Centro De La Comunidad*, 868 F.3d at 110–11. Because of the time and resources devoted to addressing the NYPD's new practice of forced removal of hijabs during protests, CAIR-NY is also less well able to carry out its historical activities in furtherance of its mission. For example, CAIR-NY is now less well able to defend hate crime victims, and it is also less well able to empower Muslims to exercise their First

9

Amendment rights, defend religious liberty, and amplify speech about Islam and Muslims. ¶¶ 94–98. In other words, its historical activities now have "less efficiency and success." *See Moya*, 975 F.3d at 130 (quotations omitted).

To be clear, unlike the advocacy organization in *FDA*, CAIR-NY was not formed in response to the challenged policy, nor were any of its pled injuries voluntarily manufactured to "gather information and advocate against" the policy through litigation or otherwise. *Contra FDA*, 602 U.S at 394. Rather, CAIR-NY is the New York state affiliate of the Council on American-Islamic Relations, founded in 1994, to amplify the voices of Muslims against discrimination and tackle urgent civil rights and societal issues. *See* ¶ 78. Nor does this litigation advance an abstract anti-NYPD social interest. *Contra id.* In fact, CAIR-NY relies on the NYPD for the protection of the rights of the Muslim community—such as through counseling hate crime victims—but the NYPD's unconstitutional policy now forces CAIR-NY to counsel those hate crime victims itself and otherwise take on work that it could previously rely on the City of New York to do. *See* ¶¶ 94–95.

These allegations, all of which Defendants overlook in their motion, are critical to CAIR-NY's standing. When considered in light of all Plaintiffs' well-pled allegations, Defendants' motion should be denied, as CAIR-NY has adequately alleged organizational standing.

## II.   DECLARATORY RELIEF IS APPROPRIATE TO REMEDY PLAINTIFFS' ONGOING HARMS, WHICH COMPENSATORY DAMAGES CANNOT ADDRESS, AND TO PREVENT FUTURE INJURIES FROM THE NYPD'S POLICY OF HIJAB REMOVAL

Each Plaintiff suffers continuing constitutional injuries and will plausibly be harmed in the future. Both these harms are independent grounds for declaratory relief. Defendants' suggestion that the Amended Complaint alleges only isolated past acts, which are not likely to be repeated, is wrong.

Declaratory relief is appropriate where there is a significant risk of harm in the future, but not so far in the future that the dispute is "nebulous or contingent." *Chelsea Grand, LLC v. N.Y. Hotel & Motel Trades Coun*cil, 729 F. App'x 33, 40 (2d Cir. 2018) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952)). Rather, the dispute must have already "taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Id*.; *see also Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023) (requiring that a case contain "a real and substantial controversy admitting of specific relief through a decree of a conclusive character" (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937))). On the other hand, the dispute cannot be solely *past* harms, for which the appropriate remedy is compensatory damages. *Dorce v. City of New York*, 2 F.4th 82, 95–96 (2d Cir. 2021).  Plaintiffs here seek relief squarely in the Goldilocks zone appropriate for declaratory relief—likely future, non-speculative harm—in two ways. First, the NYPD is likely to repeat its misconduct—to cause future harm to Plaintiffs at future protests. Second, the NYPD's past misconduct causes Plaintiffs ongoing constitutional harms that compensatory damages alone cannot remedy.

A.    **The NYPD Has Continued its Policy of Tearing Off Protestors' Hijabs as a Method of Crowd Control Meaning It Is Likely More Women, Including Ms. Azam and Ms. Howlader Again, Will Be Subject to the Same First Amendment Violations**

The NYPD has continued, is continuing, and will continue to tear off protestors' hijabs. Plaintiffs may seek declaratory relief where they plausibly allege that they will be injured again. *See, e.g.*, *Deshawn E. v. Safir*, 156 F.3d 340, 342–44 (2d Cir. 1998). But "[t]he possibility of recurring [future] injury ceases to be speculative when actual repeated incidents are documented." *Davis v. City of New York*, 902 F. Supp. 2d 405, 444 n.225 (S.D.N.Y. 2012)

11

(citation and internal quotation omitted). Declaratory relief to challenge an unlawful police practice is inappropriate if such practice is only inflicted on those committing unlawful conduct, but appropriate where the risk of injury cannot be mitigated by following the law because the harm occurs while merely "going about [one's] daily life." *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012) (unconstitutional, suspicion-less stop and frisks on the basis of race and/or national origin); *accord An v. City of New York,* No. 16-cv-5381 (LGS), 2017 WL 2376576, at *5 (S.D.N.Y. June 1, 2017) (exercising First Amendment right to record police officers). In police practice cases, some courts also consider whether the plaintiffs' theory of injunctive standing would mean any resident could bring an equivalent suit, or whether the policies are targeted at a "relatively narrow community." *See, e.g.*, *Davis*, 902 F. Supp. 2d at 444 (finding standing where unconstitutional police practices targeted NYCHA residents).

For instance, prospective relief was appropriate where two passengers who were each once subject to the NYPD practice of, without suspicion, "detaining, questioning, frisking, and searching livery car passengers" sought injunctive relief against such practice because they had shown a "reasonably likely" risk of future harm. *Battle v. City of New York*, No. 11-cv-3599 (RMB), 2012 WL 112242, at *1, 3–4 (S.D.N.Y. Jan. 13, 2012) (quotations omitted). Prospective relief was also appropriate on the independent basis they had shown the "existence of an official policy or its equivalent." *Id.*

Here, Plaintiffs have alleged a pattern of forcible hijab removals in which at least seven other women have experienced the same abuse as Ms. Howlader and Ms. Azam. Indeed, the number of women who also had their hijabs forcibly removed by the NYPD at different protests at different dates and times at the hands of different officers has increased just during the pendency of this litigation. *Compare* Dkt. No. 1 ¶ 71 (five in March 2025), *with* ¶ 71 (seven in

12

September 2025). In other words, the NYPD continues, to this day, its unlawful practice of tearing off women's hijabs. As with the taxi passengers in *Battle*, this amounts to an "official policy or its equivalent." 2012 WL 112242, at *3–4.

Given the documented "actual repeated incidents" of NYPD forced hijab removals, it is more than plausible—it is likely—that Plaintiffs will be subjected to the same NYPD policy again in the future. *See Davis*, 902 F. Supp. 2d at 444 n.225. This is particularly true given that Ms. Azam and Ms. Howlader committed no unlawful conduct to prompt NYPD action or violence; rather, they were standing peacefully in protest when unjustifiably assaulted by the police. *See Floyd*, 283 F.R.D. at 170; *An,* 2017 WL 2376576, at *5. Moreover, these policies are targeted at a "relatively narrow community," wearers of religious head coverings, meaning Plaintiffs are uniquely positioned to bring this suit relative to other New Yorkers. *See Davis*, 902 F. Supp. 2d at 444.

Because Ms. Azam and Ms. Howlader are at risk of having their hijabs forcibly removed again if they attend a protest, they have standing to seek declaratory relief. And because if more protestors have their hijabs removed—regardless whether it is Ms. Azam and Ms. Howlader again or another woman—CAIR-NY, as a frontline organization that is frequently victims' first call, is likely to field more inquiries that will continue to drain its resources and impede its mission. Declaratory relief is therefore appropriate.

### B. Plaintiffs' First Amendment Rights Are Still Being Chilled as a Result of the NYPD's Conduct, Even if Ms. Azam and Ms. Howlader Do Not Have Their Hijabs Removed at Another Protest in the Future

Declaratory relief is also appropriate because all Plaintiffs' First Amendment rights are still being chilled, and their daily lives still being impacted in ways that cannot be remedied by compensatory damages alone because of the NYPD policy.

Where plaintiffs suffer "continuing, present adverse effects" from a prior violation of their rights, prospective relief is warranted. *See, e.g.*, *Jones v. Ford Motor Credit Co.*, No. 00-cv-8330 (RJH), 2005 WL 743213, at \*13 (S.D.N.Y. Mar. 31, 2005). The difference between "recast[ing] a past harm as a continuing one," as opposed to an ongoing harm, is whether money damages alone—even if they continue to increase over time as an injury continues—is enough, or whether some form of equitable relief is necessary to make the plaintiff whole. *See Dorce*, 2 F.4th at 96. Declaratory relief is appropriate where a defendant's conduct causes "an actual and ongoing injury because it forestalls the exercise of [Plaintiffs'] alleged constitutional rights." *Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 249 (S.D.N.Y. 2011) (past denial of gun permit applications impedes present and future ability to obtain permits), *aff'd sub nom. Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012).

For instance, where President Trump blocked individual users from his Twitter account because of their expressed political views, in violation of the First Amendment, this Court held that the individual blocked users suffered a continuing harm insofar as they could not see or interact with new presidential tweets, and a free speech organization was also continually harmed because it could not observe the individual users' responses to the presidential tweets so long as the users remained blocked. *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 558, 563 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *vacated on other grounds sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). Likewise, where plaintiffs were subject to an NYPD policy of coercive interrogations, the Second Circuit held equitable relief was appropriate because the plaintiffs "continue to suffer harm from the challenged conduct because the information secured by the [police] is used to enhance their cases and to obtain plea bargains." *Deshawn E.*, 156 F.3d at 344.

14

Here, as discussed above, all Plaintiffs continue to suffer ongoing adverse consequences as a result of the NYPD's past hijab removals. First, Ms. Azam and Ms. Howlader both suffer ongoing trauma and discomfort to this day in crowds and social gatherings, which impairs their ability to exercise their constitutional rights and chills them from participating in future First Amendment protected activity. ¶¶ 39–40, 63–66; *see also* ¶ 76 ("These women are afraid to attend protests" because of the NYPD's conduct.). Contrary to Defendants' arguments, this ongoing chilling effect on their rights cannot be remedied merely by compensatory damage for the physical or emotional injuries they suffered. *See Kachalsky*, 817 F. Supp. 2d at 249; *Deshawn E.*, 156 F.3d at 344; *contra* Dkt. No. 28-1 at 10 (citing *Dorce*, 2 F.4th at 96). Moreover, as described above, CAIR-NY suffers an ongoing frustration of its mission and core activities from Defendants' practice of tearing off women's hijabs at protests because it is less well able to engage in its core business activities in furtherance of its mission. *See Knight First Amend. Inst.*, 302 F. Supp. 3d at 563. Declaratory relief is therefore warranted also on the independent basis that Plaintiffs suffer continuing injuries regardless of if Ms. Azam and Ms. Howlader again have their hijabs torn off at a protest by the NYPD as a method of crowd control.

## CONCLUSION

Plaintiffs' Amended Complaint pleads sufficient facts to allege both declaratory relief and institutional standing. Defendant's motion to dismiss should be denied.

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

O. Andrew F. Wilson
Hafsa S. Mansoor

One Rockefeller Plaza, 8th Floor
New York, New York 10020

(212) 763-5000

*Attorneys for Plaintiffs*

16

CERTIFICATION OF COMPLIANCE
WITH S.D.N.Y. LOCAL CIVIL RULE 7.1(c)

I certify that this document—excluding any caption, index, table of contents, table of authorities, signature blocks, and required certificates—contains 4,811 words, according to the word count feature of the word-processing system used to prepare the document.

_____
O. Andrew F. Wilson

17